Norman LAW, Andrew Greer, Peter Herrmann, Michael Jarvis, Jr., and Charles M. Rieb, Individually and on Behalf of All Other Similarly Situated, Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

No. 94–2053–KHV.

United States District Court,
D. Kansas.

Aug. 2, 1995.

Lori R. Schultz, W. Dennis Cross, Morrison & Hecker, Kansas City, MO, Robert G. Wilson, Raphael Cotkin, Cotkin & Collins, Los Angeles, CA, Steven M. Garber, Cotkin, Collins and Franscell, Los Angeles, CA, Gerald I. Roth, Allentown, PA, for plaintiffs Norman Law, Andrew Greer, Peter Herrmann, Michael Jarvis, Jr., Charles M. Rieb.

Linda J. Salfrank, John J. Kitchin, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, Craig T. Kenworthy, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Overland Park, KS, Alan I. Rothenberg, William J. Meeske, Latham & Watkins, Los Angeles, CA, William C. Barnard, Gayle A. Reindl, Sommer & Barnard, P.C., Indianapolis, IN, for defendant National Collegiate Athletic Ass'n.

### Memorandum and Order [1]

VRATIL, District Judge.

This matter comes before the Court on *Plaintiffs' Motion for Summary Judgment on the Issue of Liability* (Doc. # 73). Plain-

---

1. This amended Memorandum and Order supersedes the Court's previously filed Memorandum and Order, dated July 25, 1995, on the same matter.

tiffs in this suit allege that the Division I members of the National Collegiate Athletic Association ("NCAA"), in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (the "Sherman Act"), have conspired to limit the maximum compensation they will pay to one category of basketball coaches, the "restricted earnings coaches." Defendant argues that the agreement at issue here—NCAA Bylaw 11.02.3, adopted in January 1991—does not restrict plaintiffs' potential compensation; defendant further argues that in any case, Bylaw 11.02.3 does not violate the Sherman Act because the restriction is justified under the circumstances presented. Therefore, defendant maintains that the agreement embodied in Bylaw 11.02.3 is not an unreasonable restraint of trade. Plaintiffs move for summary judgment, asserting that there is no dispute about the existence or the terms of the restriction, that the restriction on its face is an impermissible restraint of trade, and that the NCAA can thus demonstrate no set of facts that would allow the restriction to pass muster under the Sherman Act.[2]

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court considers all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmoving party, however, "may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d

1238, 1241 (10th Cir.1990). Thus, summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Factual disputes about immaterial matters are irrelevant to a summary judgment determination. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1361 (10th Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). If, given the operative facts of the case, the nonmoving party fails to set forth specific facts showing that there is a genuine issue for trial and the moving party is entitled to judgment as a matter of law, then summary judgment is appropriate. *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726–27 (10th Cir.1991) (citing *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514). While it is not the trial judge's function to weigh the evidence and determine the truth of the matter at the summary judgment stage, summary judgment in favor of the moving party is nonetheless proper if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1518 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995).

Having examined the record in light of the relevant law, the Court finds that plaintiffs' motion should be sustained for the reasons stated below.

### I. Background [3]

The NCAA is an association of over 800 colleges and universities engaged in intercollegiate athletic competition. Its members are divided into Division I, Division II and Division III schools, depending on the num-

---

**2.** Coaches in two other lawsuits have brought similar antitrust challenges to Bylaw 11.02.3. *See Hall v. NCAA*, Case No. 94–2392, filed September 30, 1994; *Schreiber, et al. v. NCAA*, Case No. 95–2026, filed January 13, 1995. Plaintiffs as well as the NCAA in those cases have agreed to be bound by this Court's ruling on the pending summary judgment motions with respect to the issue of liability. *See Hall*, Stipulation and Order (Doc. # 26), filed December 19, 1994; *Schreiber*,

Stipulation and Order (Doc. # 8), filed February 6, 1995.

**3.** The following facts are either uncontroverted or, where controverted, construed in the light most favorable to the nonmoving party. Immaterial facts and factual averments not properly supported by the record are omitted.

ber of sports offered at the school, its philosophy towards athletics and athletic scholarships, the number of participants in its athletic programs, the level of attendance at athletic events, the size of the school's facilities and a number of other factors. NCAA Division I basketball programs are generally of a higher stature and have more visibility than Division II and III basketball programs. The NCAA has approximately 300 Division I schools. Each Division I member of the NCAA hires and employs its own basketball coaches.

In 1989, the NCAA established a Cost Reduction Committee, charged with the task of formulating recommendations to NCAA members for reducing costs in intercollegiate athletics without compromising access of student-athletes to higher education or disturbing the competitive balance of the NCAA. At that time, many NCAA member institutions perceived difficulties in meeting costs associated with the maintenance of intercollegiate athletic programs. For example, many NCAA institutions were reducing the number of sports they offered as a means of controlling the overall cost of their athletic programs. In addition, because of troubles in managing their overall athletic budgets, some NCAA schools found themselves in noncompliance with Title IX requirements regarding women's athletics. Financial problems notwithstanding, many NCAA institutions meanwhile felt pressure to maintain, or even increase, spending on recruiting talented players and coaches and on other aspects of their sports programs in order to stay athletically competitive with rival schools. In defendant's words, they experienced pressure to "keep up with the Joneses." The NCAA formed the Cost Reduction Committee in response to what some viewed as a catastrophic cost spiral which, if not controlled, would eventually cause the complete demise of intercollegiate athletics.

The Committee included financial aid personnel and intercollegiate athletic administrators, college presidents, a university chancellor and university faculty members. Eugene Corrigan, Commissioner of the Atlantic Coast Conference, chaired the Cost Reduction Committee. In his initial letter to committee members, Corrigan thanked them for joining "this gigantic attempt to save intercollegiate athletics from itself." Corrigan later explained the phrase "to save intercollegiate athletics from itself" to mean that a collaborative effort among NCAA members was required to maintain a level playing field because unilateral cost reduction efforts by individual members were ineffectual.[4]

Every four years, the NCAA commissions the "Raiborn Report," an analysis of financial trends and relationships in intercollegiate athletics prepared by Mitchell H. Raiborn, a professor of accounting at Bradley University. The Cost Reduction Committee used the 1986 Raiborn Report (covering the period 1981–85) to map out its task of reducing costs in intercollegiate athletics. According to the 1986 Raiborn Report, personnel, scholarships and travel comprised the largest items in the athletic budgets of member institutions, and

**4.** Another member of the Cost Reduction Committee explained this point further. Donna Lopiano testified that if one educational institution cuts costs, and its athletic competitor does not make the same reductions, the latter will be more competitive on the field than the former. To illustrate, if institution "A" unilaterally cuts its number of scholarships from 85 (the number permitted in Division I–A) to 50, institution "A" necessarily becomes less competitive than institutions that use 85 scholarships to recruit their teams. Similarly, if NCAA legislation allows 10 football coaches, and institution "A" unilaterally reduces that number to 2 football coaches, then the schools with 10 coaches will have a valuable recruiting tool, in that they will be able to offer better coach-student ratios and guarantee more individualized attention for the student-athlete's experience. Ms. Lopiano further testified that

when an institution loses athletic contests due to an "unlevel playing field," it suffers diminished revenues because it loses spectators, has disconcerted alumni and experiences other disadvantageous effects. The concept of a "level playing field" has frequently been referred to in this litigation as "competitive equity."

The NCAA's constitution describes the concept of competitive equity in this way:
*The Principle of Competitive Equity.* The structure and programs of the Association and the activities of its members shall promote opportunity for equity in competition to assure that individual student-athletes and institutions will not be prevented unfairly from achieving the benefits inherent in participation in intercollegiate athletics.
NCAA 1994–95 Manual, Const. 2.9.

the majority of institutions across the country were running deficit football and basketball programs. The 1986 Raiborn Report found that in 1985, forty-two percent of NCAA Division I schools reported deficits averaging $824,000 in their overall athletic program budgets. Regarding overall athletic department expenses, the report noted:

> The percentage increase in average expenses between 1978 and 1985 exceeds 100 percent for all institutions except [member institutions in Division III that do not have football programs].... Average 1985 [Division I] expenses of $4,609,000 are 286 percent of the 1973 average, which indicates a 186 percent increase since 1973. The long-run trend analysis ... indicates a significant percentage increase in the average expenses of each responding group.

According to the 1986 Raiborn Report, fifty-one percent of the responding Division I institutions incurred expenses exceeding revenues in their basketball programs in 1985, sustaining an average deficit of $145,000.

Early in its discussions, the Cost Reduction Committee identified five areas in which cost reduction could be achieved: financial aid, recruiting, staffing policies, competitive policies and ancillary support services. The Committee identified personnel as the largest expense in intercollegiate athletic programs and determined that costs could be reduced by curtailing football and basketball staffs and by limiting personnel in other sports as well. The Cost Reduction Committee directed its subcommittee on personnel limitations to consider, in particular, the coaching categories in football and basketball

for graduate assistants, volunteers and part-time coaches.

As a result of its deliberations, the Cost Reduction Committee proposed legislation (collectively, the "Restricted Earnings Coach Rule"), which limited the number of coaches in all Division I sports and required institutions to designate one of their coaches in every sport other than football a "restricted earnings coach." [5] In Division I men's basketball, the limit set for coaching staffs was three head or assistant coaches and one restricted earnings coach. The Restricted Earnings Coach Rule also required that restricted earnings coaches' compensation be limited to $12,000 during the academic year and $4,000 during the summer months. The Cost Reduction Committee determined that these figures approximated the cost of out-of-state tuition at public institutions and average tuition at private institutions, and was thus roughly equivalent to the salaries previously paid to graduate assistant coaches.[6] Under the rule, restricted earnings coaches may receive additional compensation for performing duties for another department of the institution during either the summer or the academic year, provided that (1) such compensation is commensurate with that received by others performing the same or similar assignments, (2) the ratio of compensation received for coaching duties and any other duties is directly proportionate to the amount of time devoted to the two areas of assignment, and (3) the individual is qualified for and performing the duties outside the athletic department for which the individual is compensated. The Division I members of the NCAA voted in January 1991 to adopt the Restricted Earnings Coach Rule effective

---

**5.** NCAA Bylaw 11.02.3 defines the position of "restricted-earnings coach"; Bylaw 11.3.4 details other aspects of compensation, benefits and expenses for restricted earnings coaches; and Bylaw 11.7.4 sets forth the number of coaches each institution may employ for each sport.

**6.** Prior to the enactment of the Restricted Earnings Coach Rule, NCAA rules provided that NCAA Division I basketball programs could employ one head coach and two full-time assistant coaches, and could fill two additional positions with part-time assistants, graduate assistants or volunteer coaches. Volunteer coaches were not entitled to receive any compensation during the

academic year or the summer months; graduate assistant coaches were allowed to receive the full value of their educational experiences, based upon their status as in-state or out-of-state residents (a "grant-in-aid"); and part-time coaches were limited in compensation to the value of a grant-in-aid based upon non-resident status. NCAA member institutions that did not have graduate schools obviously could not fill the positions designated as graduate assistant coaches. The "restricted-earnings coach" position of Bylaw 11.02.3 was intended to collapse the categories of part-time assistants, graduate assistants and volunteer coaches into a single category.

August 1, 1992.[7]

The limitations set forth in the Restricted Earnings Coach Rule reflect an effort by the Cost Reduction Committee, in its own words, to "establish a 'restricted earnings' category that will encourage the development of new coaches while more effectively limiting compensation to such coaches."[8] In addition, the chairman of the Committee told NCAA members in January 1990 that the goal of the Cost Reduction Committee was to "cut costs and save money" and that "the basic premise that we need to create legislation to save us from ourselves has overwhelming support."

The Restricted Earnings Coach Rule does not attempt to limit what member institutions spend on their basketball programs, except as to salaries of restricted earnings coaches. It does not prevent member institutions from increasing expenditures on other aspects of their athletic programs as they implement the cost reduction measures involving restricted earnings coaches. The Cost Reduction Committee did not recommend and the NCAA did not adopt any measure limiting salaries or compensation paid to other employees in athletic departments, such as head or assistant coaches.

The Restricted Earnings Coach Rule is binding on all Division I members and all restricted earnings coaches. All plaintiffs are or were employed as restricted earnings basketball coaches at NCAA Division I institutions, and their compensation as restricted earnings coaches thus is subject to and governed by the Restricted Earnings Coach Rule.

## II. *Discussion*

### A. Material Facts Undisputed

Although in resisting this motion for summary judgment the NCAA purports to controvert several of the facts set forth by plaintiffs, most of the NCAA's disputes are either about immaterial facts or merely about the implications of certain facts and their legal significance. A close review of the parties' contentions reveals that the material facts are undisputed, and the real dispute lies not in what the facts are but in how the law should be applied to those facts.

The Restricted Earnings Coach Rule speaks for itself. The parties do not dispute what it says on its face or what it requires of member institutions and restricted earnings coaches in practice. The parties do not genuinely dispute that plaintiffs fall within the category of those whom the rule was intended to affect. Likewise, the parties do not dispute that the NCAA's stated objectives in enacting the Restricted Earnings Coach Rule were to reduce costs, maintain competitive equity among member institutions and retain an entry-level position for coaches wishing to gain experience at the Division I level. Finally, the record reveals no real dispute (despite the NCAA's halfhearted attempt to create one) that Division I members of the NCAA, in the absence of rules curtailing such competition, compete with each other for the services of basketball coaches—otherwise NCAA members would have perceived

---

7. NCAA members also enacted a "grandfather clause" pertaining to prior contractual obligations between member institutions and their personnel. Bylaw 11.2.3 provides that limitations on the number of coaches do not apply in circumstances where academic tenure, enforceable written contracts or formal written security-of-employment commitments make it impossible to comply with such limits. Such exceptions continue until the end of the contract period or until normal attrition—through death, retirement or voluntary resignation—makes it possible for the institution to comply with the limitations.

8. The fuller rationale offered by the Committee for the proposed rule is as follows:

... The largest expense item in the athletics budget is personnel. Currently, only football

and basketball have limits on the number of coaches who may be employed, and the existing categorical designation of part-time graduate student and volunteer coach have not been effective in reducing the number of full-time paid employees associated with the sport. In addition, the committee recognizes the recent proliferation of part-time personnel associated with many Division I sports. Proposed limitations reflect an effort to: (1) reduce the number of coaches associated with each sport by at least one full-time equivalent position; (2) establish an "unrestricted" head or assistant coach category that will accommodate any type of volunteer, paid, full-time or part-time coach, and (3) establish a "restricted-earnings" category that will encourage the development of new coaches while more effectively limiting compensation to such coaches.

no need for a rule such as the Restricted Earnings Coach Rule, and the NCAA's repeated assertion that the rule is necessary to maintain competitive equity and to prevent schools from escalating personnel expenditures in order to "keep up with the Joneses" would be senseless. Finding no material factual dispute on this record, the Court moves directly to its analysis of the parties' legal arguments.

## B. The *Per Se* Rule

■ Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Recognizing that under this definition, almost any commercial contract could be held in violation of the law, the Supreme Court has held that only "unreasonable" restraints are unlawful. *See, e.g., Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 515–16, 55 L.Ed. 619 (1911).

■ Some activities, however, are condemned as a matter of law, without inquiry into their reasonableness, under an "illegal *per se*" approach because the probability that such activities are anticompetitive is so high. *NCAA v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 100, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984) *("Board of Regents ").* This *per se* approach is used in situations where "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). The *per se* rule is ordinarily applied to price-fixing among competitors because that is an activity which almost always tends to restrict competition. *See Board of Regents,* 468 U.S. at 100, 104 S.Ct. at 2959; *see also, United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). In *Socony–Vacuum,*

the Supreme Court explained that because of "their actual or potential threat to the central nervous system of the economy," all price-fixing agreements are banned without inquiry into their reasonableness. *Id.* at 224 n. 59, 60 S.Ct. at 845 n. 59. As plaintiffs correctly point out, a strong line of cases since *Socony–Vacuum* has firmly established that horizontal price-fixing arrangements are unreasonable on their face and are therefore *per se* violative of Section 1 of the Sherman Act, regardless of their reasonableness or possible justifications for their existence. *See, e.g., FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 432–35, 110 S.Ct. 768, 780–81, 107 L.Ed.2d 851 (1990); *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 348–51, 102 S.Ct. 2466, 2475–76, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 646–47, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980).

■ The Sherman Act's protection against price-fixing extends to sellers of goods as well as buyers, *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 235–36, 68 S.Ct. 996, 1005–06, 92 L.Ed. 1328 (1948), and to providers of labor or services as well as providers of goods, *see, e.g., Roman v. Cessna Aircraft Co.,* 55 F.3d 542, 544–45 (10th Cir.1995).[9] Schemes to fix maximum prices are subject to the same antitrust scrutiny as are schemes to fix minimum or other uniform prices. *See, e.g., Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 347–48, 102 S.Ct. 2466, 2474–75, 73 L.Ed.2d 48 (1982). Therefore, the NCAA's attempt to fix the maximum compensation its members will pay to one class of employees for their coaching services is clearly an appropriate subject of examination under the Sherman Act.

On the authority of *Socony–Vacuum* and its progeny, plaintiffs in this case urge the Court to adopt the *per se* analysis and strike down the Restricted Earnings Coach Rule as an illegal price-fixing scheme without further inquiry into its reasonableness. Defendant argues persuasively, however, that although a *per se* analysis would normally apply in a

---

9. The parties agree that NCAA restricted earnings coaches are not unionized, that no collective bargaining agreement exists in this case, and that

therefore no labor exemption from the antitrust laws applies.

case of horizontal price-fixing such as this, Supreme Court precedent forecloses application of the *per se* rule in this context.

In *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court reviewed a music company practice of issuing "blanket licenses," which authorized licensees to use a number of copyrighted musical compositions for a set fee, and found that the practice did not constitute illegal price-fixing. The blanket license was a different product, in the Court's view, than the individual compositions: it included efficiencies in integrating sales, monitoring and enforcement that the individual composers could not achieve alone. *Id.* at 20–23, 99 S.Ct. at 1562–64. Thus the Court found that the blanket license was a cooperative arrangement in which the "agreement on price [wa]s necessary to market the product at all." *Id.* at 23, 99 S.Ct. at 1564. Under these unique circumstances, the Court held that cursory application of the *per se* rule would be inappropriate and, instead, determined that the agreement should be subjected to the more discriminating examination required under the rule of reason. *Id.* at 24, 99 S.Ct. at 1564–65.

The Supreme Court declined again to apply the *per se* rule in a later case involving the NCAA. In *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the Court evaluated an NCAA plan which limited the conditions and prices that member institutions could negotiate in television contracts for college football games. Noting that "[w]hat the NCAA and its member institutions market ... is competition itself—contests between competing institutions," the Court found that the NCAA was "an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101, 104 S.Ct. at 2960; *see also Banks v. NCAA*, 977 F.2d 1081, 1088 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993); *Hennessey v. NCAA*, 564 F.2d 1136, 1152–53 (5th Cir.1977). Thus the Court decided again that it would be inappropriate to apply a *per se* rule, and it instead chose to undertake the

wider-ranging rule of reason inquiry. *See Board of Regents*, 468 U.S. at 100, 104 S.Ct. at 2959.

The NCAA's argument in this case, both for the application of the rule of reason rather than the *per se* rule and for its ultimate conclusion that the Restricted Earnings Coach Rule is a justifiable and necessary restraint of trade, substantially tracks the Supreme Court's reasoning in *Board of Regents*. Therefore, it will be useful to quote at length from that opinion. The Court there explained:

> A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of [sports]—college [sports]. The identification of this "product" with an academic tradition differentiates college [sports] from and makes [them] more popular than professional sports to which [they] might otherwise be comparable.... In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college [sports] to preserve [their] character, and as a result enables a product to be marketed which might otherwise be unavailable.

*Id.* at 101–02, 104 S.Ct. at 2960. Thus, the Court concluded that although the *Board of Regents* case involved restraints on the ability of member institutions to compete in terms of price and output, because of the NCAA's unique position in the marketplace for college sports, a fair evaluation of the competitive or anticompetitive character of the restraints required consideration of the NCAA's justifications for adopting such re-

straints—a rule of reason rather than a *per se* analysis. *Id.* at 103, 104 S.Ct. at 2961.[10]

■■■ Although this Court concludes from the Supreme Court's analysis in *Board of Regents* that the NCAA's "vital role" in making college sports available to the public entitles it to a rule of reason review of the NCAA legislation at issue here, the Court does not believe that the Supreme Court intended to give the NCAA carte blanche in imposing restraints of trade on its member institutions or other parties because of its role in the marketplace. There can be no doubt that the NCAA is subject to the antitrust laws, and even though it escapes having the bylaw struck down as a *per se* violation of the Sherman Act, the NCAA still must justify the restraint under the rubric of the rule of reason.

## C. The Rule of Reason

■■■ The Supreme Court first defined the rule of reason in *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (*"Chicago Board of Trade"*):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 244. The contours of the inquiry have remained largely unaltered since then. *See United States v. Brown University*, 5 F.3d 658, 668 n. 8 (3d Cir.1993). Basically, the test involves a balancing of all of the circumstances of the case to determine whether the challenged restraint unreasonably restricts competitive conditions. *See id.* at 668 (citing *Continental T.V. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). The fundamental inquiry under the rule of reason is the same as under the *per se* rule: what the competitive significance of the challenged restraint is and whether the restraint enhances competition. *Board of Regents*, 468 U.S. at 103–04, 104 S.Ct. at 2961. There is often no bright line separating rule of reason from *per se* analysis. *Id.* at 104 n. 26, 104 S.Ct. at 2961 n. 26.

■■■ Under the rule of reason, the plaintiff bears an initial burden of showing that the alleged agreement causes adverse, anticompetitive effects in the relevant market. *See Brown University*, 5 F.3d at 668. The plaintiff may satisfy this burden either by demonstrating actual anticompetitive effects or by offering proof of the defendant's market power. *Id.* Once the plaintiff has adduced sufficient evidence of actual anticompetitive effects or market power, "the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. If the defendant does so, the burden shifts back to the plaintiff to show that the restraint is not reasonably necessary to accomplish the stated objective. *Id.* If the defendant does not offer any legitimate justifications, the finding of adverse competitive impact or market power prevails, and " 'the court condemns the practice without ado.' " *Id.* (quoting *Chicago Professional Sports Ltd. Part-*

---

**10.** The Court's decision to apply rule of reason analysis in *Board of Regents* does not necessarily mean that it adopted the same exception to the *per se* rule that it found applicable in *Broadcast Music*. In the end, although the NCAA argued that its actions, like the music companies' actions in *Broadcast Music*, constituted a cooperative "joint venture" which created efficiencies in the market and thus were procompetitive, the *Board of Regents* Court rejected the conclusion that the television rights in that case presented a situation similar to the one in *Broadcast Music*. Rather, the Court noted that "[u]nlike *Broadcast Music*'s blanket license covering broadcast rights to a large number of individual compositions, here the same rights are still sold on an individual basis, only in a non-competitive market." *Board of Regents*, 468 U.S. at 113–14, 104 S.Ct. at 2967. Plaintiffs argue here that they still attempt to sell their coaching services to NCAA member institutions which compete with each other in the hiring of coaches, only they too now do so in a non-competitive market.

*nership v. National Basketball Ass'n,* 961 F.2d 667, 674 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992)).

■ In *Board of Regents,* the Supreme Court adopted a "quick look" rule of reason standard. This abbreviated inquiry applies in cases where *per se* condemnation of a practice is inappropriate, but where no elaborate industry analysis is necessary to reveal the anticompetitive character of an inherently suspect restraint. *Id.* (citing *Board of Regents,* 468 U.S. at 109, 104 S.Ct. at 2964). Thus, under the quick look standard because adverse effects on competition are apparent, the court does not require proof of market power, and instead moves directly to an analysis of the defendant's proffered competitive justifications for the restraint.

### D. Effects of the Restricted Earnings Coach Rule

■ The NCAA first argues that the Restricted Earnings Coach Rule has no anticompetitive effect because restricted earnings coaches may avoid the restraining effect of the rule by obtaining coaching positions with high school teams, non-NCAA college teams, NCAA Division II or III teams, overseas teams or, in fact, by obtaining other employment not related to their coaching duties.[11] At best, this argument amounts to an assertion that because Division I restricted earnings coach positions represent such a small portion of the market, the NCAA has no market power in this arena and thus its restraint can have no adverse competitive impact.

■ This argument by the NCAA is wholly unconvincing. The absence of proof of market power does not foreclose a finding of anticompetitive behavior under the Sherman Act. *See Board of Regents,* 468 U.S. at 109, 104 S.Ct. at 2964. In fact, where there is an agreement not to compete in terms of price, " 'no elaborate industry analysis is re-

quired to demonstrate the anticompetitive character of such an agreement.' " *Id.* (quoting *National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1366, 55 L.Ed.2d 637 (1978)). Where a restraint runs counter to the Sherman Act's requirement that price be responsive to consumer preference, proof of market power is unnecessary because such an agreement's anticompetitive character is evident. *See Board of Regents,* 468 U.S. at 110, 104 S.Ct. at 2965.

■ The NCAA acknowledges that before the rule was enacted, some restricted earnings coaches were paid $60,000 to $70,000—apparently because the schools that employed them believed their services were worth that amount. Controlling such responses to consumer preference was in fact the very objective which the NCAA sought to achieve in enacting the rule. Sometimes the rule of reason may be applied "in the twinkling of an eye," *Id.* at 109 n. 39, 104 S.Ct. at 2964 n. 39 (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981)); and this . is surely one such case. Because the Restricted Earnings Coach Rule specifically prohibits the free operation of a market responsive to demand and is thus inconsistent with the Sherman Act's mandates, it is not necessary for the Court to undertake an extensive market analysis to determine that the rule has had an anticompetitive effect on the market for coaching services.

■ The NCAA next argues that its regulation may even be procompetitive because, if the NCAA does not collapse as a result of its skyrocketing costs, it will be able to continue providing the product of college basketball and there will thus continue to be jobs available in the market for basketball coaches. For all its alarming rhetoric, however, the NCAA has offered no compelling evidence that its member institutions are on the

11. Defendant's argument—essentially that price-fixing victims can simply go elsewhere and get a job in another part of the economy that is not fixed—is, of course, absurd and cannot carry the day for the NCAA in this litigation. *See, e.g., Roman v. Cessna Aircraft Co.,* 55 F.3d 542, 544

(10th Cir.1995) ("plaintiffs whose opportunities in the employment market have been impaired by an anticompetitive agreement directed at them as a particular segment of employees have suffered an antitrust injury under the governing standard").

brink of financial disaster or that the *de minimus* effect which reducing the salaries of the lowest paid member of each school's coaching staff by a few thousand dollars would pull them back from the abyss. Moreover, even if the situation of intercollegiate athletics was every bit as dire as the NCAA makes it out to be in resisting the coaches' challenge to the Restricted Earnings Coach Rule, the NCAA's argument—that the regulation is procompetitive because it will help the NCAA schools stay in the black so that they can continue providing intercollegiate athletics at all—cannot succeed.

■ The market for coaching services is different from the market for intercollegiate sports. In the market for coaching services, coaches are the producers and schools are the consumers, whereas in the market for intercollegiate sports, the schools become the producers and the public the consumers. Procompetitive justifications for price-fixing must apply to the same market in which the restraint is found, not to some other market. *See United States v. Topco Assoc., Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972) (competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy"); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 370, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963) (anticompetitive effects in one market cannot be justified by procompetitive consequences in another); *Sullivan v. National Football League,* 34 F.3d 1091, 1112 (1st Cir.1994) (it seems "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market"),

*cert. denied,* —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995). If price-fixing buyers were allowed to justify their actions by claiming procompetitive benefits in the product market, they would almost always be able to do so by arguing that the restraint was designed to reduce their costs and thereby make them collectively more competitive sellers. To permit such a justification would be to give businesses a blanket exemption from the antitrust laws and a practically limitless license to engage in horizontal price-fixing aimed at suppliers. This license the Court will not issue—even in the unique context of intercollegiate athletics.

E. NCAA Justifications for the Restricted Earnings Coach Rule

■ Because the Restricted Earnings Coach Rule constitutes a restraint on the operation of a free market, and because the uncontroverted facts demonstrate that its effect has been to stabilize and, in some cases, depress prices in the market for coaching services, the rule of reason next places on the NCAA a "heavy burden of establishing an affirmative defense which competitively justifies" this infringement on the Sherman Act's protected domain. *See Board of Regents,* 468 U.S. at 113, 104 S.Ct. at 2966–67.

■ The NCAA attempts to carry its burden by emphasizing the importance of maintaining a level playing field in the sports arena, retaining and fostering the spirit of amateurism which is one of college athletics' defining characteristics, and protecting NCAA member institutions from self-imposed, ruinous cost increases.[12] In doing so, the NCAA relies heavily on two earlier cases which held that NCAA coaching restrictions were not inconsistent with the antitrust laws and were, in fact, legitimate and necessary

---

12. The NCAA also asserts that by enforcing the Restricted Earnings Coach Rule it is maintaining an "entry-level" position for coaches who are young and/or inexperienced in the field. By enacting the salary cap, the NCAA sought to level the playing field by weeding out more experienced and seasoned coaches; ostensibly, more experienced coaches would not be willing to work for only $16,000 per year. However, the NCAA has introduced no evidence whatsoever that its method has been effective in making more opportunities available for younger or more inexperienced coaches. Nor has it introduced evidence that any seasoned coaches who were drawing $60,000 to $70,000 under the old salary regime have ceded their positions to the younger and more inexperienced coaches waiting to fill their shoes. In fact, the NCAA has not introduced evidence of a single restricted earnings coaching position which has been made available to a younger, more inexperienced coach that would not have been available in the previously unrestricted market for coaching services.

means of maintaining competitive equity and the other values the NCAA seeks to protect. Those cases are: *Board of Regents of the Univ. of Oklahoma v. National Collegiate Athletic Ass'n,* 561 P.2d 499 (Okla.1977) (*"Oklahoma Board of Regents"*), and *Hennessey v. National Collegiate Athletic Ass'n,* 564 F.2d 1136 (5th Cir.1977).

The *Hennessey* case and the *Oklahoma Board of Regents* case, decided well before the Supreme Court issued its opinion in *Board of Regents,* were both challenges to an NCAA bylaw adopted in 1976 that limited the number of Division I football and basketball coaches member institutions could employ. In upholding the bylaw, the Fifth Circuit in *Hennessey* and the Oklahoma Supreme Court in *Oklahoma Board of Regents* both gave deference to the NCAA's motives in enacting the challenged restriction. In *Hennessey,* the court noted that plaintiffs had presented no evidence that the NCAA intended to *injure* the affected coaches by adopting the bylaw and that, to the contrary, "the fundamental objective in mind was to preserve and foster competition in intercollegiate athletics—by curtailing, as it were, potentially monopolistic practices by the more powerful—and to reorient the programs into their traditional role as amateur sports operating as part of the educational processes." *Hennessey,* 564 F.2d at 1153. The NCAA, of course, asserts the same motivating objective in this litigation.

Significantly, in attempting to balance the NCAA's professed good intentions with the anticompetitive nature of the coaching restriction, the *Hennessey* court noted that on the evidence presented, it was difficult to determine what the actual effects of the restriction would be, since the rule had only been in effect for one month. *See id.* The court recognized that one possible consequence of that bylaw would be to "stabilize, if not depress, the compensation which any assistant coach can obtain for his services." *Id.* However, the court concluded that if that should happen and actual experience under the bylaw run counter to the NCAA's expectations and good intentions, a court could certainly consider that evidence in re-

evaluating the restraint in a later case. *See id.* at 1154.

In contrast to the bylaw at issue in *Hennessey,* the explicit intent of the Restricted Earnings Coach Rule at issue here was both to stabilize *and* depress the compensation of restricted earnings coaches. This Court therefore does not need the experience of time which the *Hennessey* court felt it was lacking in order to make a judgment about the potential effects of the restraint. Moreover, we believe that the *Hennessey* court placed undue emphasis on the NCAA's stated good intentions—not only in light of the Supreme Court's clear articulation of the proper antitrust analysis in *Board of Regents,* but also in light of clearly established precedent existing at the time of the *Hennessey* decision itself. Although intent is relevant in helping a court interpret facts and predict consequences in this type of case, "a good intention will [not] save an otherwise objectionable regulation...." *Chicago Board of Trade,* 246 U.S. at 238, 38 S.Ct. at 244; *see also Board of Regents,* 468 U.S. at 101 n. 23, 104 S.Ct. at 2960 n. 23 ("it is ... well settled that good motives will not validate an otherwise anticompetitive practice").

Similarly, in *Oklahoma Board of Regents,* the court deferred to the NCAA membership's "avowed" purpose in enacting the limitation of coaching staffs, which was maintaining the principles of a level playing field and the spirit of amateurism through cutting costs. The Oklahoma Supreme Court noted there that it was the "considered opinion of a majority of the [member institutions] that a limit on coaching staffs [wa]s the best way to achieve [those] goals," and it declined to substitute its own judgment for theirs. *Oklahoma Board of Regents,* 561 P.2d at 507. Since the plaintiff in that case did not establish that it was *un*reasonable for the NCAA to concern itself with those goals, and since the plaintiff could not demonstrate that the bylaw would *not* effect the cost reduction and competitive equity that the NCAA sought to achieve, the Oklahoma court found in favor of the NCAA.

The Supreme Court in *Board of Regents,* however, clarified that the burden of proof in an antitrust case is somewhat differ-

ent from what the Oklahoma court articulated: under the rule of reason, the proponent—not the challenger—of a facially anticompetitive measure carries "a heavy burden of establishing an affirmative defense which competitively justifies [such an] apparent deviation from the operations of a free market." *Board of Regents*, 468 U.S. at 113, 104 S.Ct. at 2966.[13] The NCAA has repeatedly and vigorously urged this Court to shift the burden and require the coaches here to "prove a negative"—that the Restricted Earnings Coach Rule is *un*justifiable under rule of reason antitrust analysis. In support, the NCAA quotes the following language from *Board of Regents:*

> It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics. The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the

eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.

*Id.* at 117, 104 S.Ct. at 2969. This language does not create a presumption of reasonableness for any regulation the NCAA chooses to enact, nor does it alter the burden of proof. Rather, the Court's general observation merely reiterates its previous comment that certain regulations which may restrain economic competition—rules dictating the size of the field, the number of players on each team, the extent to which physical violence should be allowed, that athletes should not be paid and that they must attend class—are crucial to the well-being of amateur athletic competition. *See id.* at 101–02, 104 S.Ct. at 2960. Moreover, the regulations referred to by the *Board of Regents* court are qualitatively a far cry from a regulation limiting the amount of compensation a professional coach, or even a graduate student assistant coach, can earn as a livelihood for providing services to NCAA member schools.[14]

**13.** Another statement in *Oklahoma Board of Regents* requires comment here because the NCAA in briefs submitted to this Court misconstrues its significance. In support of its argument that Bylaw 11.02.3 is reasonable, the NCAA cites the Oklahoma Supreme Court's statement that "[t]he fundamental test of the reasonableness of restraint is its effect on the public." *Oklahoma Board of Regents*, 561 P.2d at 506. The NCAA's argument goes something like this: the cost spiral of personnel expenses under which the NCAA currently labors, if not curbed, will eventually and inevitably cause the complete demise of intercollegiate athletics; since Bylaw 11.02.3 cuts costs, it forestalls such demise and is thus good for the public interest because the public enjoys intercollegiate athletics. Even if the NCAA's scenario is a true depiction of the current economic landscape of intercollegiate athletics, the Supreme Court has emphasized that the actual test for reasonableness is much more limited: the relevant test is the restraint's effect on economic competition, not merely on the public interest. *See Board of Regents*, 468 U.S. at 104, 113, 104 S.Ct. at 2962, 2966–67. The Oklahoma court in mentioning the public interest may have had in mind not the wide-ranging reasonableness test that the NCAA urges us to adopt here, but something more akin to the Tenth Circuit's recent holding in an antitrust case—that the public's interest is in "open and unrestrained competition." *See Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 974 (10th Cir.) (jury instruction defining public interest as "open

and unrestrained competition" did not invite jury to consider matters other than effects of restraint on competition), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). The public's interest in and enjoyment of intercollegiate sports is, in this case, entirely irrelevant.

**14.** The NCAA's argument that the Restricted Earnings Coach Rule preserves the spirit of amateurism strays from the concept of amateurism as it was originally conceived by the NCAA and as it is discussed in other cases.

Defendant relies heavily on *Banks v. NCAA*, 977 F.2d 1081 (7th Cir.1992), and *Justice v. NCAA*, 577 F.Supp. 356 (D.Ariz.1983), in advancing its argument that the NCAA must be afforded plenty of room under the antitrust laws in order to preserve the amateur character of intercollegiate sports contests; however, neither case is on point. *Banks* dealt with no-draft and no-agent eligibility rules imposed by the NCAA on student-athletes; *Justice* involved sanctions imposed upon an NCAA member institution for infractions of NCAA rules against providing compensation and other benefits to student-athletes. Those cases are about ensuring that college *players*—student-athletes—are amateurs; they are not about preserving the amateurism of *coaches* by capping their salaries or by any other means. Likewise, the article of the NCAA's own constitution defining the principle of amateurism refers only to student-athletes:

■ In this litigation, the NCAA attempts to obtain leniency for its restricted earnings salary cap by characterizing it as a noncommercial regulation. The NCAA cites the district court's opinion in *Board of Regents* to support its position that noncommercial activities of the NCAA are reasonable methods of preserving competition in college sports. Finding previous cases regarding noncommercial NCAA regulations inapposite to its evaluation of the commercial restrictions on television contracts at issue, the court in that case noted,

> Several courts have analyzed the non-commercial activities of NCAA and concluded that they were reasonable methods of preserving and regulating competition in intercollegiate football.... However, none of these cases dealt with the commercial activities of NCAA. These [commercial] activities are far different from regulations governing the size of coaching staffs or rules on academic eligibility. There is only a tenuous relationship between such non-commercial regulations and the marketplace. Moreover, the non-commercial regulations relate more directly and effectively to the preservation of competitive balance. In this case, the commercial activities of NCAA have a direct and substantial anti-competitive effect on the marketplace, and contribute only indirectly, if at all, to the legitimate non-commercial goals of NCAA.

*Board of Regents of the Univ. of Oklahoma v. National Collegiate Athletic Ass'n*, 546 F.Supp. 1276, 1316 (W.D.Okla.1982) (citations omitted). The NCAA has not persuaded this Court that the relationship between the Restricted Earnings Coach Rule's salary cap and prices in the market for coaching services is at all tenuous or indirect. On the contrary, the relationship is direct, substantial and demonstrable. As the NCAA admits, the rule is directly responsible for a reduction in certain coaches' salaries. Furthermore, the NCAA has not demonstrated through any plausible evidence that the rule's restraint relates directly and effectively to the preservation of competitive balance, amateurism or any other legitimate, *non* commercial goal; instead, it offers only argument on this point. It is far from clear to this Court that the act of imposing a ceiling on the salaries of one class of employees in the labor market could possibly be characterized as "noncommercial," especially given the NCAA's express purpose of cutting costs in doing so.

■ While the Supreme Court in *Board of Regents* accepted competitive balance as a legitimate objective for the NCAA and was willing to assume that most NCAA regulations are justifiable means of accomplishing that objective, the Court required that regulations with anticompetitive effects be somehow related or tailored to the interests they purport to protect. *See Board of Regents*, 468 U.S. at 118–19, 104 S.Ct. at 2969. Because the television restrictions in that case were not closely tailored to the NCAA's proffered justifications regarding competitive balance and amateurism—the same justifica-

---

Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and *student-athletes* should be protected from exploitation by professional and commercial enterprises.

NCAA 1994–95 Manual, Const. 2.8 (emphasis added).

In this litigation, the NCAA has not indicated any way in which the Restricted Earnings Coach Rule would enhance amateurism among student-athletes in the way that other regulations designed to foster amateurism have done so.

Referring to cases where sports associations had regulated permissible racquet size in tennis, player safety requirements in hockey, and drug use in horse showing, the *Justice* court noted that

"actions by sports organizations in preserving the integrity of the sport and fair competition are reasonable restraints under the rule of reason, even if they operate to exclude some competitors and thus have an incidental anticompetitive effect." *Justice*, 577 F.Supp. at 382 n. 17. The NCAA attempts to use this statement to support its position that the Restricted Earnings Coach Rule is a reasonable restraint of trade. However, not only is the statement dicta, from an inapposite case, taken out of context, but it also underscores a fundamental problem in defendant's case: namely, that the NCAA has not proven that the Restricted Earnings Coach Rule was implemented to "preserv[e] the integrity of the sport and fair competition." Furthermore, the NCAA has not proven that the Restricted Earnings Coach Rule's anticompetitive effect is merely "incidental" to the action.

tions the NCAA offers here—the Court invalidated the restraints. *Id.* For purposes of this motion, the Court accepts that cost-cutting measures are needed, that amateurism and competitive equity should be maintained, and that retaining a coaching position for an entry-level coach benefits both coaches and NCAA member institutions. Nevertheless, the NCAA has not demonstrated the necessary link between these stated objectives and the Restricted Earnings Coach Rule.

■■■■ "Even if an anticompetitive restraint is intended to achieve a legitimate objective, the restraint only survives a rule of reason analysis if it is reasonably necessary to achieve the legitimate objectives proffered by the defendant." *Brown University,* 5 F.3d at 678–79. To determine if a restraint is reasonably necessary, a court first examines whether the restraint furthers the legitimate objectives, and then whether comparable benefits could be achieved through substantially less restrictive means. *Id.* at 679; *see also North American Soccer League v. National Football League,* 670 F.2d 1249, 1261 (2d Cir.), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982).

The NCAA has not cleared the first of these two hurdles. As noted previously, the NCAA has offered no evidence that the Restricted Earnings Coach Rule furthers its stated objectives at all. The NCAA's stated objectives are to level the playing field to obtain competitive equity, to provide for an entry-level coaching position and to cut costs. The NCAA has submitted no evidence to this Court that requiring schools to pay their fourth-ranked basketball coaches all the same low salary levels the playing field in any significant way, especially when there is no limit on how disparately the three more senior coaches may be paid by competitor schools. Similarly, the NCAA has presented no evidence that the restricted earnings coach positions are now more likely to be filled by young or inexperienced coaches than they were when salaries were competitive. Nor has the NCAA offered any evidence that the Restricted Earnings Coach Rule really achieves an overall reduction in costs; as stipulated by the parties, nothing in the Re-

stricted Earnings Coach Rule prevents NCAA schools from spending money saved (if any) from fixing the restricted earnings coach's salary on some other aspect of their basketball programs, such as increasing the head coach's salary. Because the NCAA has failed to meet its burden of establishing that the Restricted Earnings Coach Rule actually promotes a legitimate, procompetitive objective, it is unnecessary for plaintiffs to demonstrate that the Restricted Earnings Coach Rule is the least restrictive alternative available to the NCAA to achieve its stated goals or that comparable benefits could be achieved through viable, less restrictive means.

Because the Restricted Earnings Coach Rule is a restraint of trade as prohibited by the Sherman Act, the NCAA bears a heavy burden in this case to establish that the restraint enhances competition or, in other words, promotes a legitimate, procompetitive goal. On this record, the Court finds that the NCAA has not met this weighty burden and that plaintiffs are entitled to judgment as a matter of law on the issue of liability.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion for Summary Judgment on the Issue of Liability* (Doc. # 73) be and hereby is sustained.