101 F.3d 1315
 1996-2 Trade Cases P 71,633, 114 Ed. Law Rep. 771,
96 Cal. Daily Op. Serv. 8710,
96 Daily Journal D.A.R. 14,419,
96 Daily Journal D.A.R. 15,209
 Russell HAIRSTON; Frank Garcia; Jaime Weindl; Jovan
McCoy; Kyle Roberts; Scoreboard, Inc., a Washington
corporation; Team Spirit, Inc., a Washington corporation;
Graham S. Anderson, Plaintiffs-Appellants,
v.
PACIFIC 10 CONFERENCE, an unincorporated association;
National Collegiate Athletic Association, an
unincorporated association, Defendants-Appellees.
 No. 95-35309.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 6, 1996.
Decided Dec. 3, 1996.
As Amended Dec. 19, 1996.
 
 James L. Magee, Graham & Dunn; and Michael D. Hunsinger, Neubauer & Hunsinger, Seattle, WA, for plaintiffs-appellants.
 Richard J. Wallis (Al Van Kampen and John A. Tondini on the briefs), Bogle & Gates, Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington, Barbara J. Rothstein, District Judge, Presiding. D.C. No. CV-93-01763-BJR.
 Before: WRIGHT, HALL and TROTT, Circuit Judges.
 Opinion by Judge HALL; Separate Concurrence by Judge TROTT.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Russell Hairston, Frank Garcia, Jovan McCoy and Kyle Roberts appeal the district court's order granting summary judgment in favor of defendant-appellee, the Pacific-10 Conference ("Pac-10"). The district court had jurisdiction over this matter pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.
 
 I.
 
 2
 Appellants are former and current University of Washington ("UW") football players. Appellee, the Pacific-10 Conference ("Pac-10"), is an unincorporated association of ten universities situated in California, Arizona, Oregon and Washington,[1] formed for the purpose of "establishing an athletic program to be participated in by the members."
 
 
 3
 On November 5, 1992, the Seattle Times reported that UW's star quarterback, Billy Joe Hobert, had received three loans totalling $50,000 from an Idaho businessman. After investigating the allegations, UW officials suspended Hobert and declared him permanently ineligible to play amateur football. One month later, the Los Angeles Times published a series of articles alleging that UW's football program had violated several NCAA rules. At this time, UW, in conjunction with Pac-10 officials, began investigating these alleged irregularities.
 
 
 4
 After conducting an eight-month investigation into the allegations of recruiting improprieties, the Pac-10 placed the UW football team on probation for recruiting violations. The levied sanctions included: (1) a two-year bowl ban covering the 1993 and 1994 seasons; (2) a one-year television revenue ban; (3) a limit of 15 football scholarships each for the 1994-95 and the 1995-96 academic years; (4) a reduction in the number of permissible football recruiting visits from 70 to 35 in 1993-94 and to 40 in 1994-95; and (5) a two-year probationary period.
 
 
 5
 The imposition of penalties on the UW Huskies devastated both the players and their fans. In an effort to have the sanctions rescinded, appellants filed a complaint against the Pac-10. In their complaint, appellants alleged antitrust violations under Section One of the Sherman Act, 15 U.S.C. § 1, and breach of contract. They argued that the penalties were "grossly disproportionate to the University's violations" and evidence of a conspiracy engineered by UW's Pac-10 competitors to sideline UW's football program and thereby improve their own records and odds of winning a post-season bowl game berth. Besides injunctive relief[2] appellants also sought damages, which would include the cost of air fare, lodging, meals and expenses related to a trip to play in a post-season bowl game.
 
 
 6
 The Pac-10 responded by filing a motion to dismiss all claims. In its motion, the Pac-10 contended that the players lacked constitutional and antitrust standing. The Pac-10's motion was granted in part as to certain plaintiffs not included in this appeal, but denied as to the issue of the players' standing. Hairston v. Pacific-10 Conference, 893 F.Supp. 1485 (W.D.Wash.1994) ("Hairston I"). The district court found that because the players had demonstrated direct antitrust injury, they could pursue their antitrust claims. Id. at 1491-92. However, the court dismissed the players' breach of contract claim because it found that the players were not intended third-party beneficiaries of the contract between and among Pac-10 member schools. Id. at 1494.
 
 
 7
 The Pac-10 then filed a motion for summary judgment alleging that appellants had failed to present any evidence of anticompetitive conspiracy among Pac-10 members or between the Pac-10 and the NCAA. The court agreed and granted the Pac-10's motion. Hairston v. Pacific-10 Conference, 893 F.Supp. 1495, 1496 (W.D.Wash.1995) ("Hairston II").
 
 This appeal then followed.[3]
 II.
 
 8
 A district court opinion granting summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).
 
 III.
 
 9
 On appeal, the Pac-10 contends that the motion for summary judgment should be affirmed because appellants lack antitrust standing under Section 4 of the Clayton Act, 15 U.S.C. § 4. Although we are not persuaded by the reasoning in the district court's opinion, Hairston I, 893 F.Supp. at 1490-92, we need not decide whether appellants have met the requirements for antitrust standing, because they have failed to establish any violation of the antitrust laws.
 
 
 10
 As Professors Areeda and Hovenkamp have observed:
 
 
 11
 When a court concludes that no violation has occurred, it has no occasion to consider [antitrust] standing.... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government--which enjoys automatic standing--must be dismissed.
 
 
 12
 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law p 360f, at 202-03 (rev. ed. 1995) (footnotes omitted); accord Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir.1996) (declining to reach the issue of standing because appellant had failed to demonstrate existence of antitrust violation); see Sicor Ltd. v. Cetus Corp., 51 F.3d 848, 855 n. 10 (9th Cir.) cert. denied, --- U.S. ----, 116 S.Ct. 170, 133 L.Ed.2d 111 (1995) (choosing not to reach standing issue because appellant had not made out claim of antitrust injury); see also McCormack v. Nat'l Collegiate Athletic Assoc., 845 F.2d 1338, 1343 (5th Cir.1988) (punting on standing issue and reaching merits of antitrust claim). The Sherman Act requires, at a minimum, that appellants prove that the Pac-10's actions had an anticompetitive effect. It is on this showing that appellants' claim fails, and accordingly we decide this case on the merits.
 
 IV.
 
 13
 Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States[.] ..." 15 U.S.C. § 1. In order to establish a claim under Section 1, the players must demonstrate: "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1410 (9th Cir.), cert. denied, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991) (citation omitted).
 
 
 14
 The first and third elements of this test are not at issue. The Pac-10 members' agreement to sanction UW fulfills the "contract, combination, or conspiracy" prong. See NCAA v. Board of Regents of Univ. of Okla., 468 U.S. 85, 99, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984) ("NCAA member institutions have created a horizontal restraint-an agreement among competitors on the way in which they will compete against each other."). The parties do not dispute that the agreement affects interstate commerce. Thus, the only issue is whether the sanctions constituted an unreasonable restraint of trade. We analyze this question using the rule of reason analysis. Id. at 103, 104 S.Ct. at 2961.
 
 
 15
 Under the rule of reason, the fact-finder examines the restraint at issue and determines whether the restraint's harm to competition outweighs the restraint's procompetitive effects. Bhan, 929 F.2d at 1413. The plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within the relevant product and geographic markets. If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. The plaintiff must then show that "any legitimate objectives can be achieved in a substantially less restrictive manner." Id.
 
 
 16
 Here, the plaintiffs met their initial burden by showing that the Pac-10 members banned UW from participating in bowl games for two years. The Pac-10 replied with evidence showing that there are significant procompetitive effects of punishing football programs that violate the Pac-10's amateurism rules.[4] The burden then returned to the athletes to show that the Pac-10's procompetitive objectives could be achieved in a substantially less restrictive manner. The players' burden of proof at the summary judgment stage of the proceedings was not high; all they had to do was present more than a "mere scintilla of evidence to support [their] case." City of Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1369 (9th Cir.), cert. denied, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). This they failed to do.
 
 
 17
 The athletes claim that the Pac-10's penalties were grossly disproportionate to UW's violations. However, they do not offer even the thinnest reed of support for this proposition. They point to the testimony of Robert Aronson, a law professor at the University of Washington, who analyzed the sanctions imposed against the UW compared to sanctions imposed against similar institutions. Aronson, however, testified that the penalties were within the range of appropriate penalties. The players also claim that the NCAA's report on the Pac-10's sanctions concludes that the penalties were disproportionate. It does not. The report actually states that the Pac-10's penalties were too lenient, not that they were too harsh. In short, the athletes have presented no evidence that would allow a jury to find in their favor. Hence summary judgment was proper.
 
 V.
 
 18
 Appellants also argue that the district court erred in dismissing their breach of contract claim. A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is reviewed de novo. Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995).
 
 
 19
 In their complaint, the players alleged that the Pac-10's Constitution, Bylaws and Articles created a contract between the conference and its members, and that the players were third-party beneficiaries of this contract. The players further contend that the Pac-10 breached this contract when it levied unreasonable sanctions against UW, thereby injuring the players as beneficiaries.
 
 
 20
 Under Washington law, to create a third-party beneficiary contract, the parties must intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract. Postlewait Constr. Inc. v. Great American Ins., 106 Wash.2d 96, 720 P.2d 805, 806 (1986). "The test of intent is an objective one; the key is not whether the contracting parties had an altruistic motive or desire to benefit the third party, but rather whether performance under the contract would necessarily and directly benefit that party." Id. 720 P.2d at 806-07. To determine the contracting parties' intent, the court should construe the contract as a whole, in light of the circumstances under which it was made. Id. at 807.
 
 
 21
 To support their claim, appellants point to the language of the Pac-10 Constitution. Under its "Statement of Purpose," the conference notes that its goal is "to enrich and balance the athletic and educational experiences of student-athletes at its member institutions, [and] to enhance athletic and academic integrity among its members."
 
 
 22
 By joining the Pac-10, members are obligated to "administer [an] athletic program in accordance with the Constitution, Bylaws, and other legislation of the Conference," "conduct [their] intercollegiate athletic program in keeping with the highest recognized standards and in a manner which will enhance the reputation for integrity of the Pacific-10 Conference," "assure the intercollegiate athletic program is maintained as an integral part of the educational objectives and programs on the campus of each Pacific-10 Conference member institution," and "participate in the sports of football and basketball."
 
 
 23
 The ultimate goal of the conference is realization of certain values including: "[a]cademic and athletic achievement of student-athletes," "increased educational opportunities for young people," "quality competitive opportunities for student-athletes," and "amateurism in intercollegiate athletics."
 
 
 24
 In dismissing appellants' contract claim, the district court found that this language largely consisted of "vague, hortatory pronouncements in the contract" and that "[b]y themselves, these pronouncements are not sufficient to support the players' claims that the Pac-10 intended to assume a direct contractual obligation to every football player on a Pac-10 team." Hairston I, 893 F.Supp. at 1494. We agree.
 
 
 25
 The key here is that appellants have not demonstrated that the parties intended to create direct legal obligations between themselves and the students. Other than the statements from the Pac-10's Constitution, By-laws and other legislation, appellants have failed to provide any evidence that the parties intended to create a contractual obligation; accordingly, we find their claim without merit.
 
 VI.
 
 26
 Appellants have failed to show that the penalties the Pac-10 imposed constituted an unreasonable restraint of trade. As a result, no antitrust violation occurred. Appellants also have failed to allege a breach-of-contract claim since no language in the contract shows the Pac-10 and its members intended to assume a direct obligation to the students. For these reasons, we AFFIRM.
 
 
 27
 TROTT, Circuit Judge, concurring in the result.
 
 
 28
 I concur wholeheartedly in Judge Hall's excellent analysis of the merits of the appellants' failed attempt to mount an antitrust case against the NCAA and the Pac-10. I write separately, however, to point out that there is yet another significant reason to affirm the district court's dismissal of this case: Hairston and his colleagues manifestly lack antitrust standing to bring this lawsuit, and thus cannot even qualify as valid plaintiffs. By not deciding this threshold issue, I'm concerned that we might encourage other potential litigants to limber up their bats to take unwarranted swings at targets legally beyond their reach. My concern is aroused because we leave intact and on the books the district court's holding that these plaintiffs do have antitrust standing, a holding which I respectfully believe is demonstrably erroneous. See Hairston v. Pacific-10 Conference, 893 F.Supp. 1485 (W.D.Wash.1994).
 
 
 29
 The district court's flawed analysis may encourage antitrust lawsuits such as this one every time a player feels injured by a conference sanction. In my judgment, this case presents an appropriate opportunity to advise such potential litigants that they do not have standing to come into court with these kinds of alleged injuries. The fact that these plaintiffs have struck out on the merits is no assurance that the next group of distant plaintiffs denied a free vacation will be dissuaded from filing equally frivolous lawsuits. Such entirely self-referential forays into court unnecessarily tax the time, resources, and energy of their targets, not to mention those of the court. Thus, I offer my interpretation of the majority's unexplained statement that they "are not persuaded by the reasoning in the district court's opinion" regarding the antitrust standing issue.
 
 
 30
 "Establishment of [antitrust] standing, logically, precedes the presentation of a plaintiff's case." R.C. Dick Geothermal v. Thermogenics, Inc., 890 F.2d 139, 152 (9th Cir.1989) (en banc). In fact, in Thermogenics we likened antitrust standing to the need to get to first base before one can score a home run. Id. at 145. But this unremarkable principle is based on more than logic: it is based also on the intent of Congress as expressed in Supreme Court precedent. As the Court has explained, Congress, in enacting section 4 of the Clayton Act, "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council, 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983) (internal quotation omitted). Thus, "in such case ... the alleged injury [of a plaintiff] must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." Id. at 539, 103 S.Ct. at 909.
 
 
 31
 Antitrust standing is different, of course, from standing in the constitutional sense. Associated Gen. Contractors, 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. The plaintiff's ability to fulfill the requirements of antitrust standing is an essential threshold element of an antitrust case whereas constitutional standing is essential to the jurisdiction of the court. Thermogenics, 890 F.2d at 145. In order to have antitrust standing, the plaintiff must show that he or she has suffered "antitrust injury." If this burden is met, the plaintiff must also show that he or she is an appropriate antitrust plaintiff. It is on this second ground that the instant plaintiffs' lawsuit surely fails. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 109 n. 5, 107 S.Ct. 484, 488-89 n. 5, 93 L.Ed.2d 427 (1986); see also Blue Shield of Virginia v. McCready, 457 U.S. 465, 473, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982) (limiting the section 4 remedy to "particular class of persons ... for redress of particular forms of injury."); Exhibitors' Serv., Inc. v. American Multi-Cinema, 788 F.2d 574, 576 n. 1 (9th Cir.1986) (substituting "proper party" for "antitrust standing").
 
 
 32
 The inquiry as to whether a litigant is a proper antitrust plaintiff looks both at how connected the players' injuries are to the alleged antitrust violation, see Associated Gen. Contractors, 459 U.S. at 534, 103 S.Ct. at 906 ("An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable.") (internal quotation omitted), and whether the players appropriately fulfill the private attorneys' general function of the Clayton Act. See Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 542 (9th Cir.1987) (applying private attorneys' general theory to determine whether plaintiffs had antitrust standing). In order to determine if a plaintiff is proper, we look at several factors, none of which is controlling: 1) the character of the damages, including the risk of duplicative recovery, the complexity of apportionment, and whether the damages' character makes them too speculative; 2) the specific intent of the alleged conspiracy; 3) the directness of the injury; and 4) the existence of other, more appropriate plaintiffs. See Thermogenics, 890 F.2d at 146.[1]
 
 
 33
 To start our analysis of these factors, we look first to the character of the damages alleged. The minimal damages at issue here are not difficult to apportion because the players seek only damages related to an all-expense paid trip to a bowl game, including air fare, lodging and meals. Separating these damages from the loss suffered by the school is easy. There certainly is no need for "long and complicated proceedings involving massive evidence and complicated theories." Associated Gen. Contractors, 459 U.S. at 544, 103 S.Ct. at 911. Accordingly, this factor does not cut against the plaintiffs.
 
 
 34
 The specific intent of the Pac-10 query, however, does work against the athletes. No one alleges that the Pac-10 was out to punish the athletes, and even the players admit in their brief that "the penalties were imposed by competitors who did not ... consider the impact on the players."
 
 
 35
 Nor can the athletes show a direct causal connection between the alleged violation and the alleged injury sufficient to satisfy the third prong of the test. The players argue they were the direct victims because barring the UW football team from playing in a postseason bowl game prohibits them from participating in that game. However, the players' position is analogous to that of the employees in Eagle, 812 F.2d 538. In Eagle, the plaintiffs were crewmembers on fishing vessels whose wages were tied to the value of their catch. The defendants were canneries accused of setting the price of tuna artificially low. The court held that only the vessel-owners were directly injured, and that any injury suffered by the crewmembers was derived from the vessel owners' loss. Id. at 541. Likewise, only the University of Washington was directly injured here, and the players' injuries derived from that loss.
 
 
 36
 The biggest flaw in the plaintiffs' case, however, is that another, more appropriate plaintiff exists: the University of Washington. The antitrust injury that the plaintiffs allege--loss of the trip to San Antonio--is insignificant in comparison to the millions of dollars the University allegedly lost because of these sanctions. Therefore, it seems unlikely that denying the athletes antitrust standing would "leave a significant antitrust violation undetected or unremedied." Associated Gen. Contractors, 459 U.S. at 542, 103 S.Ct. at 911.
 
 
 37
 The players argue unpersuasively that the UW is not a more appropriate antitrust plaintiff because it has a strong incentive not to sue the Pac-10. If the players are not permitted to bring this suit, they say, any antitrust violation the Pac-10 committed would go unpunished. However, other colleges have challenged college sporting associations and have still remained a part of the association after the litigation. See, e.g., NCAA v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Moreover, as this court said in Exhibitors' Serv., Inc. v. American Multi-Cinema, 788 F.2d 574, 581 (9th Cir.1986), "we cannot agree with [the] premise that every restraint must become the subject of a private antitrust action even when those directly injured do not choose to make it so."
 
 
 38
 Finally, the practical consequences of allowing the players to bring this lawsuit after their university-which has suffered enormous economic losses-has agreed to the sanctions, demonstrates that the players are not the proper antitrust plaintiffs. If we were to hold that these four players had antitrust standing to alter the sanctions against the UW, we would invite numerous groups of indirectly injured parties to bring antitrust lawsuits and argue that the Pac-10 should have imposed different sanctions or remedies. For example, freshmen players would want sanctions to be immediately imposed so that they could be free of them in the later years when they are more likely to play. Senior players would want deferred penalties so that they could finish school before the penalties took effect. Football players would want their schools to pay monetary fines and not be prohibited from televised games or postseason play. But monetary fines would adversely affect funding of other athletic programs and harm other athletes. Other players might then complain that their interests had been violated. The sanctioned university is in the best position to balance these competing interests, and, if necessary, bring an antitrust action.
 
 
 39
 After balancing the different factors, I conclude that the players have failed utterly to show that they are proper antitrust plaintiffs. Therefore, because the players lack antitrust standing, I would reverse the district court's published order of May 20, 1994 which held to the contrary. In all other respects, I concur in Judge Hall's opinion.
 
 
 
 [1]
 The Pac-10 includes: the University of Washington, Washington State University, University of Oregon, Oregon State University, University of California, Berkeley, Stanford University, University of California, Los Angeles, University of Southern California, Arizona State University and the University of Arizona
 
 
 [2]
 Because the penalty period imposed on UW has ended, the appellants' claims for injunctive relief are moot
 
 
 [3]
 Prior to filing this appeal, the players stipulated to the dismissal of the NCAA as a defendant. Thus, only the Pac-10 remains as a defendant-appellee
 
 
 [4]
 As the Supreme Court explained in NCAA,
 [T]he NCAA seeks to market a particular brand of football-college football. The identification of this "product" with an academic tradition differentiates college football and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend classes, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice-not only the choices available to sports fans but also those available to athletes-and hence can be viewed as procompetitive.
 NCAA, 468 U.S. at 101-02, 104 S.Ct. at 2960-61.
 
 
 [1]
 In Thermogenics, 890 F.2d at 146, we also looked at "the nature of the plaintiff's claimed injury." However, this factor is more properly considered when performing the "antitrust injury" analysis