**In re NCAA I–A WALK–ON
FOOTBALL PLAYERS
LITIGATION**

No. C04–1254C.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 14, 2005.

Douglas Edward Smith, James B. Stoetzer, Lane Powell PC, Seattle, WA, Gregory L. Curtner, Kimberly K. Kefalas, Robert J. Wierenga, Miller Canfield, Paddock & Stone, Ann Arbor, MI, for NCAA I–A Walk–On Football Players Litigation.

## ORDER

COUGHENOUR, District Judge.

## I. INTRODUCTION

This matter comes before the Court on Defendant's Motion for Judgment on the Pleadings Pursuant to Fed.R.Civ.P. 12(c) (Dkt. No. 30). The Court has considered the papers submitted by the parties and has determined that oral argument is not necessary. The Court hereby finds and rules as follows.

## II. BACKGROUND

Defendant, the National Collegiate Athletic Association ("NCAA"), is a voluntary, non-profit standard-setting association that promulgates the rules of competition for and operates annual national championships in 22 sports across three divisions. Its membership includes over 1,200 educational institutions, athletics conferences, and related organizations. It promulgates rules of play, recruiting, length of season, amateurism, and equipment regulations, operates championships and maintains intercollegiate athletics records. Plaintiffs are walk-on football players at Division I–

A schools who allege that they would have received full grant-in-aid scholarships but for the anti-competitive agreement between the Division I–A members of the NCAA to save money by artificially restricting the number of football scholarships awarded by each school to 85.

Plaintiffs' Amended Complaint sets forth their argument as follows: the NCAA and Division I–A schools, in the name of "cost-containment," have entered into an "agreement" or "rule," codified in Bylaw 15.5.5,[1] which "artificially restrains the number of scholarships that a school may award to football team roster members." (Am. Compl. ¶ 6.) This practice, they allege, is an unlawful horizontal restraint of trade that violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and is a monopolization of the "big-time college football market" in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

The NCAA now moves the Court for judgment on the pleadings on the basis of the following arguments: (1) NCAA rules preserving amateurism and protecting fair competition have been uniformly upheld under the Sherman Act; (2) Plaintiffs have not alleged a legally cognizable relevant market; (3) Plaintiffs have not alleged injury to competition; and (4) Plaintiffs' Section 2 claim fails as a matter of law because the Amended Complaint contains insufficient factual allegations showing that the NCAA has monopoly power in any relevant market.

## III. LEGAL STANDARD

■ At any time after the pleadings close but "within such time as not to delay the trial," a party may move for a judgment on the pleadings. FED. R. CIV. P.

12(c). The moving party bears the burden of establishing on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law. *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 529 (9th Cir.1997). The Court must take all allegations in the pleading as true and construe them in the light most favorable to the non-moving party. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir.1988). Nonetheless, conclusory allegations that a defendant violated antitrust laws, absent sufficient facts to support a cause of action, are insufficient to state a claim. *Id. See also Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir.1987) (stating "the pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiff[ ] will get nowhere by dressing them up in the language of antitrust."). Yet, the issue is not whether a plaintiff will or not ultimately prevail on his or her claim, but whether he or she is entitled to offer evidence in support of the allegations in the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## IV. SECTION 1 OF THE SHERMAN ACT

■ Section 1 of the Sherman Act states as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

---

1. Bylaw 15.5.5 concerns Football Scholarship Limitations and provides in pertinent part: "[t]here shall be ... an annual limit of 85 on the total number of counters [per Bylaw 15.02.3.1] (including initial counters) in football at each Division I–A institution." *2003–04 NCAA Bylaw Division I Manual*, Bylaw 15.5.5.1 (Pls.' Am. Compl., Ex. A at 101).

15 U.S.C. § 1. This broad mandate has been narrowed to bar only "unreasonable restraints of trade." *See, e.g., Standard Oil Co. of N.J. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

The inquiry under Section 1 "is confined to a consideration of impact on competitive conditions," and the function of the court is "to form a judgment about the competitive significance of the restraint." *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 690, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Where conduct does not restrain "commercial competition in the marketing of goods or services," it is not a "restraint of trade or commerce" cognizable under Section 1. *Apex Hosiery v. Leader,* 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). Therefore, to make out a prima facie case under Section 1, a plaintiff must prove (1) participation in an agreement that (2) unreasonably restrained trade in the relevant market. *Law v. NCAA,* 134 F.3d 1010, 1016 (10th Cir.1998).

Defendant does not argue that Plaintiffs have not properly pled the first element. Rather, all of Defendant's arguments flow from the second prong, namely that (1) By-law 15.5.5's scholarship limit does not affect interstate commerce; (2) even if it did affect interstate commerce, Plaintiffs have failed to identify a relevant market, and (3) Plaintiffs have failed to demonstrate injury to competition.

### A. Trade or Commerce

The NCAA first argues that its bylaws are non-commercial rules since there is no trade or commerce in student athletes. In making this argument, the NCAA attempts to characterize this case as challenging the NCAA's protection of amateurism in so-called "big-time college football." The NCAA argues that *NCAA v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), and its progeny hold that the NCAA's amateurism rules have legally prohibited the creation of a commercial market for the services of student-athletes and do not violate the Sherman Act. Thus, the NCAA concludes, the scholarship limits at issue in this case fall clearly within the types of NCAA rulemaking which courts have repeatedly found are not subject to the Sherman Act.

The law is clear that athletes may not be "paid to play." *See Bd. of Regents,* 468 U.S. at 119 nn. 65, 66, 104 S.Ct. 2948; *McCormack v. NCAA,* 845 F.2d 1338 (5th Cir.1988); *Banks v. NCAA,* 977 F.2d 1081, 1090 (7th Cir.1992). Accordingly, courts have regularly upheld NCAA bylaws protecting amateurism in college athletics. *See Smith v. NCAA,* 139 F.3d 180, 185–86 (3d Cir.1998) (rule prevented participation by graduate student who had been an undergraduate at a different institution); *Banks v. NCAA,* 977 F.2d 1081, 1089–90 (7th Cir.1992) (rules revoked athlete's eligibility to participate in an intercollegiate sport in the event that the athlete chose to enter a professional draft or engage an agent to help secure a position with a professional team); *McCormack v. NCAA,* 845 F.2d 1338, 1345 (5th Cir.1988) (rules limited compensation for football players to scholarships with limited financial benefits); *Hennessey v. NCAA,* 564 F.2d 1136, 1153 (5th Cir.1977) (rule limited the maximum number of assistant football and basketball coaches Division I institutions could employ); *Bowers v. NCAA,* 9 F.Supp.2d 460, 497–98 (D.N.J.1998) (rule set minimum academic standards for participation); *Gaines v. NCAA,* 746 F.Supp. 738, 744 (M.D.Tenn.1990) (rules revoked athlete's eligibility to participate in an intercollegiate sport in the event that the athlete chose to enter a professional draft

or engage an agent to help secure a position with a professional team); *Justice v. NCAA,* 577 F.Supp. 356, 382 (D.Ariz.1983) (rule denied athlete eligibility to participate in an intercollegiate sport if the athlete accepted pay for participation in the sport).

 At the same time, however, the NCAA is not exempt from scrutiny under the Sherman Act. *See, e.g., Bd. of Regents,* 468 U.S. at 98–100, 104 S.Ct. 2948. Moreover, courts have also found the award of financial aid to college students to be "trade or commerce" and therefore subject to the Sherman Act. *See U.S. v. Brown Univ.,* 5 F.3d 658, 667 (3d Cir.1993) (citing *Board of Regents,* 468 U.S. at 100 n. 22, 104 S.Ct. 2948) (holding that "payment of tuition in return for educational services constitutes commerce"); *Hamilton Chapter of Alpha Delta Phi v. Hamilton College,* 128 F.3d 59, 66 (2d Cir.1997);[2] *cf. Dedication & Everlasting Love to Animals v. Humane Society of the United States, Inc.,* 50 F.3d 710 (9th Cir.1995) (finding that the Humane Society's solicitation of donations is not engagement in trade or commerce). Two courts have even held that NCAA rules and regulations implicate "trade or commerce." *See Metro. Intercollegiate Basketball Ass'n v. NCAA,* 339 F.Supp.2d 545, 550–52 (S.D.N.Y.2004) (rules affected Division I men's college basketball post-season tournaments); *Law v. NCAA,* 902 F.Supp. 1394, 1410 (D.Kan.1995) (rule limited the maximum compensation Division I members paid to one category of basketball coaches).

 Mindful of the standard under Rule 12(c), at this stage of the litigation the Court finds that By-law 15.5.5 does not clearly implicate student-athlete eligibility in the same manner as rules requiring students to attend class and rules revoking eligibility for entering a professional draft. Thus, the NCAA's attempt to frame this case as challenging to amateurism of Division I–A football is a mis-characterization of the issues raised by Plaintiffs' Amended Complaint. These allegations, which must be taken as true at this stage of the litigation, state that the scholarship restrictions were developed to contain costs, not to advance amateurism. (*See* Am. Compl. ¶ 70 (stating "[t]he present scholarship restraints were imposed in an attempt to reduce the costs of operating a big-time college football program, and for no other reason."); *Id.* ¶ 84 (stating "[t]he scholarship limits were developed to contain costs by reducing the expenditures needed to maintain a big-time college football program. They were not developed in an effort to increase competitive balance").). Accordingly, the numerical scholarship limitation at issue in this case is not on all fours with those cases which hold that NCAA eligibility rules are not subject to the Sherman Act. Rather than substitute its own interpretation of the function By-law 15.5.5 serves, the Court is guided by those cases finding that a determination of whether an activity constitutes "trade or commerce" depends on a factual inquiry.

---

2. Notably, *Hamilton* concerns a case in a similar procedural posture as the one at bar. In *Hamilton,* several fraternities challenged Hamilton College's residential policy requiring all students to live in college housing and participate in the college meal plan as an unlawful monopoly under the Sherman Act. 128 F.3d at 61. Upon reviewing the district court's dismissal under Fed.R.Civ.P. 12(b)(1), the Second Circuit found that the district court had erred in failing to accept as true the fraternities' allegations that Hamilton College adopted the residential policy for the commercial purpose of raising revenue, and in substituting its own opinion that the policy concerned education rather than commercial gain. *Id.* at 66.

*Brown Univ.,* 5 F.3d at 666 (considering "the nature of the conduct in light of the totality of surrounding circumstances"). Plaintiffs are entitled to offer evidence in support of the allegations in the Amended Complaint.

### B. Relevant Market

The NCAA also asserts that judgment on the pleadings is warranted because Plaintiffs have failed to allege a legally cognizable relevant market because there is no "commercial" or "employment market" for the services of Division I–A football players, and because Plaintiffs fail to define or identify consumer substitutability, interchangeability, or cross-elasticity of demand. Plaintiffs contend, however, that their definition of the relevant market as "Division I–A football" (Am.Compl.¶¶ 31–37) is sufficient to survive a Rule 12(c) motion.

■■■■■ Plaintiffs bear the burden of defining the relevant market in this case. *Tanaka v. NCAA,* 252 F.3d 1059, 1063 (9th Cir.2001). Normally, market definition is "essential" to claims under § 1 and § 2 in which the rule of reason[3] is applied. *Gough v. Rossmoor Corp.,* 585 F.2d 381, 389 (9th Cir.1978). However, the Supreme Court has applied a truncated rule of reason analysis, sometimes known as a "quick look rule of reason analysis," and held some horizontal conduct unlawful without the market analysis traditionally required under the rule of reason. *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 459–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Plaintiffs argue that the restraint at issue in the case at bar should simply be judged using a "quick look" rule of reason analysis.

■■■■■ The Court finds it is unnecessary at this stage to determine whether it is required to analyze Plaintiffs' claims using a "quick look" rule of reason or full-scale rule of reason analysis, because Plaintiffs have alleged a sufficient "input" market in which NCAA member schools compete for skilled amateur football players. *Cf. Law I,* 902 F.Supp. at 1406 (stating "[t]he market for coaching services is different from the market for intercollegiate sports. In the market for coaching services, coaches are producers and schools are the consumers"). The Amended Complaint refers to plaintiffs as necessary "inputs" to the production of Division I–A football. (*See, e.g.,* Am. Compl. ¶ 72 ("Division I–A schools, have through this joint agreement and cartel action, decreased the cost of one of their key inputs—college football players").) It also alleges that there are no other viable options for students wishing to make full use of their skills at the highest level of competition (*Id.* ¶ 36), thus satisfying the requirement that a product market include the pool of goods or services that enjoy "reasonable interchangeability of use and cross-elasticity of demand." *See Tanaka,* 252 F.3d at 1063. The fact that it is a single product market is not fatal to Plaintiffs' claim. *See Int'l Boxing Club v. U.S.,* 358 U.S. 242, 249–52, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (finding that championship boxing is a relevant market separate from other levels of boxing). Given the procedural posture of this case, the Court finds that Plaintiffs are entitled to the opportunity to prove their allegation that there is a relevant market.

---

**3.** A rule of reason analysis is clearly warranted in this case. *Cf. Bd. of Regents,* 468 U.S. at 100–101, 104 S.Ct. 2948 (holding that when a case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all, such as intercollegiate amateur athletics, a rule of reason analysis is appropriate); *Law II,* 134 F.3d at 1048 (applying rule of reason analysis to NCAA rule concerning college basketball).

## C. Injury to Competition

The NCAA also argues that Plaintiffs have failed to allege facts showing that the challenged football scholarship limits substantially injure economic competition as a whole in any relevant market. They seek some reference to economic injury to consumer welfare.

■■■ Failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings. *Tanaka,* 252 F.3d at 1064. Generally, the test for harm to competition is whether consumer welfare has been harmed such that there has been a decrease in allocative efficiency and an increase in price. *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir.1995). The market alleged here is a monopsony.[4] Injury to competition can occur by monopsony just as it may result from monopoly. *See Nat'l Macaroni Mfrs. Ass'n v. FTC,* 345 F.2d 421, 426 (7th Cir.1965) (agreeing with the FTC that "where all or the dominant firms in a market combine to fix the composition of their product with the design and result of depressing the price of an essential raw material, they violate the rule against price-fixing agreements"). Since Plaintiffs' Amended Complaint describes the injury as injury to the input market (*see* Am. Compl. ¶ 79 "many walk-ons leave school with enormous student loans that they must pay off after they leave school."; *Id.* ¶ 87 "NCAA and its members have saved hundreds of millions in scholarship monies they would have paid in a market where free competition had been allowed to occur."), Plaintiffs have sufficiently alleged injury to competition to survive Defendant's Rule 12(c) motion.

## IV. Section 2 of the Sherman Act

Finally, NCAA argues that Plaintiffs' Second and Third Claims, which allege monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act are defective because the Amended Complaint lacks adequate factual allegations showing that the NCAA has monopoly power in any relevant market.

■■■ To allege a claim for actual monopolization under Section 2 of the Sherman Act, a plaintiff must show that "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant willfully acquired or maintained its monopoly through exclusionary conduct; and (3) the defendant caused antitrust injury." *American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns., Inc.,* 108 F.3d 1147, 1151 (9th Cir.1997). Monopoly power has traditionally been defined as "the power to control market prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■■■ Plaintiffs allege that the NCAA "operates as a classic cartel" because it is "a combination of producers of a product joined together to control its production, sale, and price." (Am.Compl.¶ 39.) They also allege that the NCAA "exercises an almost absolute control over intercollegiate athletics," including the input market of Division I–A football players. (*Id.* ¶ 40). Indeed, the NCAA's power to control intercollegiate athletics has been noted by other courts. *See, e.g., Bd. of Regents,* 468 U.S. at 99, 104 S.Ct. 2948; *Law II,* 134 F.3d at 1012; *Hennessey,* 564 F.2d at 1147; *Gaines,* 746 F.Supp. at 745. In light of the monopsony discussion above, the Court finds that Plaintiffs have al-

---

4. A monopsony occurs when a single purchaser dominates the relevant market for a factor of production. *United States v. Syufy Enters.,* 903 F.2d 659, 663 n. 4 (9th Cir.1990).

leged sufficient facts that the NCAA has monopoly power over the alleged market. Plaintiffs should have the opportunity to demonstrate that this monopoly caused antitrust injury.

## V. CONCLUSION

For the reasons stated above, the Court DENIES Defendant's Motion for Judgment on the Pleadings.

SO ORDERED.